IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 3:05-CR-0093 |
| | ) | |
| ERIK B. BLOWERS, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM ORDER**

TILLEY, Chief Judge

This case arises from the prosecution of Agent Erik B. Blowers ("Agent Blowers") by the United States of America and is currently before the Court on Defendant, Agent Blowers', Motion for Kastigar Hearing, Motion to Dismiss, and Motion to Suppress [Doc. # 46] ("Motion for Kastigar Hearing").

For the reasons set forth below, it will be ordered that Agent Blowers' Motion for Kastigar Hearing will be GRANTED in part, and DENIED in part.

I.

Defendant Blowers was indicted by a grand jury sitting in Charlotte, North Carolina on April 12, 2005. The indictment charged Agent Blowers with knowingly and willfully making a false material statement on October 31, 2000 to the Federal Bureau of Investigation on a Confidential Financial Disclosure Report in violation of Title 18, United States Code, § 1001(a)(2).

Agent Blowers, a law school graduate, is a Special Agent with the FBI and has almost 16 years experience. He began his duty as an agent in the Charlotte

DOCUMENT SCANNED

Field Office in 1989 and was promoted in February of 1999 to the position of Chief

Division Counsel for the Charlotte Division, which includes all of North Carolina.

From April 2, 2000 to June 30, 2000, Agent Blowers was also the Acting

Supervisory Special Agent (Acting SSA) of the white Collar Crime Squad of the

Charlotte Field Office. As Chief Division Counsel, Agent Blowers was responsible

for numerous matters, including advising the Division agents on ethics matters.

Agent Blowers is charged with providing false information on his Confidential

Financial Disclosure Report for the year 2000. This charge stems from gifts that

he allegedly received from David Simonini, a former cooperating witness for the FBI

and a person who was, at the time, the subject of a preliminary investigation by

the white collar crime squad, in connection with two trips he took to Las Vegas

with Simonini in April and August of 2000. These trips were not reported on

Agent Blowers' 2000 Financial Disclosure Report. The decision to seek the

indictment of Agent Blowers was made by the Public Integrity Section of the

Criminal Division of the U.S. Department of Justice.[1] Eric A. Johnson, Special

Agent in the Office of the Inspector General ("OIG") was asked by his OIG

superiors to investigate the allegations referred from the Public Integrity Section,

---

[1] In May 2001 Agent Blowers was interviewed by the Special Agent in Charge ("SAC"), Agent Swecker, and the Assistant Special Agent in Charge ("ASAC"), Agent O'Korn, regarding rumors of his involvement with Simonini. No actions were taken as a result of that interview. An administrative investigation was instituted by the FBI Office of Professional Responsibility ("FBI-OPR") in February of 2003. It was not until the Public Integrity Section received new allegations in June of 2003 that it began investigating Agent Blowers.

Criminal Division of the United States Department of Justice. (Johnson Aff. ¶¶ 1-

2.) From that point forward, Agent Johnson appears to be the lead investigator

into Agent Blowers' case.

Agent Blowers now claims that he made compelled and, therefore, protected

statements, regarding both this case and unrelated matters, that have been used

improperly by the government during the course of this investigation. He identifies

the following four statements as the basis for his motion:

> (1) A discussion with his supervisors, Special Agent in Charge
> ("SAC") Chris Swecker and Assistant Special Agent in Charge
> ("ASAC") Victor R. O'Korn, concerning his relationship with David
> Simonini in May of 2001 ("May 2001 Statement").

> (2) A statement provided by Agent Blowers to the FBI Office of Public
> Responsibility ("FBI-OPR") on December 4, 2000, concerning an
> unrelated administrative investigation of Agent Blowers ("December 4,
> 2000 Statement").

> (3) A February 20, 2002 statement provided by Agent Blowers to the
> DOJ-OIG concerning an unrelated administrative investigation of
> another agent ("February 20, 2002 Statement").

> (4) A May 19, 2003 statement, which Agent Blowers provided to FBI-
> OPR concerning an investigation of an allegation directly related to this
> case ("May 19, 2003 Statement").

Agent Blowers claims these statements were compelled <u>Garrity</u> statements,[2]

---

[2]In <u>Garrity v. New Jersey</u>, 385 U.S. 493, 495, 87 S.Ct 616, 617 (1967) the
Supreme Court considered whether incriminating statements made by police
officers were "compelled," and their later used against the officers, therefore,
prohibited, when a state statute required the officers either to respond to questions
or be involuntarily terminated from their jobs. "The question is whether the
accused was deprived of his 'free choice to admit, to deny, or refuse to answer."
<u>Id.</u> at 496 (internal citation omitted).

that were then used by the government in preparing this case for indictment.  He also contends that the government intends to use these statements at pretrial hearings and at trial.  On August 3, 2005 Agent Blowers filed this motion requesting a Kastigar hearing[3] to determine whether the government can prove that each piece of its evidence comes from a source independent of these statements [Doc. #46].  Agent Blowers' Motion for Kastigar hearing asks that at the conclusion of the hearing the Court dismiss the Indictment or in the alternative suppress all Garrity statements and evidence gained directly or indirectly from those statements.  The government responded to Agent Blowers' motion in the Consolidated Response of the United States to Pretrial Motions and Motion in Limine on September 9, 2005 [Doc. # 56].  Agent Blowers' reply to the Government's consolidated response was filed on September 23, 2005 [Doc. #57].[4]

II.

The Fifth Amendment to the United States Constitution provides that "No

---

[3]In Kastigar v. United States,  406 U.S. 441, 461-62, 92 S.Ct. 1653, 1665 (1972), the Supreme Court held that a person whose testimony has been compelled is entitled to a hearing to determine whether those statements were impermissibly used directly or indirectly to gather other incriminating evidence or whether the government's evidence has a basis independent of the compelled statements.

[4] An Amicus Memorandum in Support of Motion for Kastigar Hearing was filed by The Federal Bureau of Investigation Agents' Association on September 29, 2005 [Doc. # 58].

4

person ... shall be compelled in any criminal case to be a witness against himself ...." U.S. Const. amend V.  In <u>Garrity v. New Jersey</u>, the Supreme Court established that the Fifth Amendment's protection extends to persons who have no choice but to speak or face dismissal from public employment.  385 U.S. 493, 500, 87 S.Ct 616, 617 (1967).  However, in <u>Kastigar v. United States</u>, the Supreme Court than held that a grant of "use" immunity under 18 U.S.C. § 6002 enables the government to compel a witness's self-incriminating testimony.[5] 406 U.S. 441, 461-62, 92 S.Ct. 1653, 1665 (1972).  Section 6002 "prohibits the prosecutorial authorities from using the compelled testimony in *any* respect, and it therefore cannot lead to the infliction of criminal penalties on the witness." <u>Id.</u> at 453.  "The scope of immunity provided by § 6002 is coextensive with the scope of the Fifth Amendment privilege against compelled self-incrimination." <u>Id.</u> at 448-49.

When a claim is raised under this statute, the claimant must first show that he testified under a grant of immunity.  Once this is established, the burden then shifts to the government to prove that its evidence comes from sources independent of the compelled testimony. <u>Id.</u> at 461-62.  To allow the government

---

[5]Use immunity is to be distinguished from the broader concept of transactional immunity.  Transactional immunity "protects an individual against prosecution for anything concerning the substance of compelled testimony," while "use immunity protects against the government's use of compulsory testimony as a source of evidence, leaving the government free to use any other evidence to prosecute." <u>United States v. Harris</u>, 973 F.2d 333, 336 (4th Cir. 1992).

the opportunity to meet this burden, the district court holds what is commonly referred to as a <u>Kastigar</u> hearing.[6] <u>United States v. Harris</u>, 973 F.2d 333, 336 (4th Cir. 1992). In the <u>Kastigar</u> hearing the government has the affirmative burden to make its proof by a preponderance of the evidence. <u>Id.</u> (noting that the standard of proof is a preponderance of the evidence even though the government's burden is often referred to as a "heavy burden"). The Court in <u>Kastigar</u> also explained that the "total prohibition on use provides a comprehensive safeguard, barring the use of compelled testimony as an 'investigatory lead,' and also barring the use of any evidence obtained by focusing investigation on a witness as a result of his compelled disclosures." <u>Harris</u>, 973 F.2d at 336-371 (quoting, <u>Kastigar</u>, 406 U.S. at 460). Thus, the government may not even alter its investigatory strategy as a result of information contained in an immunized statement. <u>Harris</u>, 973 F.2d at 336.

Once Agent Blowers establishes that his statements were compelled, the government then has the burden of proving all the evidence it proposes to use was

_____

[6]Although some circuits have allowed the government to meet its burden through the affidavit evidence alone, the Fourth Circuit has not addressed this issue. <u>See</u>, <u>e.g.</u>, <u>United States v. Montoya</u>, 45 F.3d 1286, 1298 (9th Cir. 1995) (holding government may meet <u>Kastigar</u> burden through affidavits). However, Fourth Circuit jurisprudence suggests that a <u>Kastigar</u> hearing is certainly the norm, if not required. <u>See</u> <u>Harris</u>, 973 F.2d at 336 ("When the government decides to prosecute a previously use-immunized witness, the district court *must* hold a so-called <u>Kastigar</u> hearing...") (emphasis added); <u>United States v. Hughes</u>, Nos. 95-5501, 95-5502, 1996 WL 389479, at *3 (4th Cir.) ("This mandate compels the district court to hold a '<u>Kastigar</u> hearing....'").

derived from legitimate independent sources.  Thus each of the four statements will be considered individually to determine first if it was compelled, and second whether a <u>Kastigar</u> hearing is necessary for the government to prove that the statement was not used, in any way, against Agent Blowers.

II.

The first statement at issue is the May 2001 discussion that Agent Blowers had with his supervisors regarding his relationship with David Simonini.  Agent Blowers made statements to his immediate supervisors in the Charlotte Division, SAC Chris Swecker and ASAC Victor O'Korn, acknowledging that he traveled with David Simonini to Las Vegas, Nevada.  Agent Blowers claims that those statements were compelled because he believed that if he did not answer the questions of his supervisors, he would have been fired.

A Fifth Amendment issue under <u>Garrity</u> only arises if the defendant has been forced to choose between his livelihood as a government employee and his right to remain silent.  385 U.S. at 495 ("The choice imposed on petitioners was one between self-incrimination or job forfeiture); <u>c.f.</u> <u>Hill v. Johnson</u>, 160 F.3d 469, 471 (8th Cir. 1998) ("The Fifth Amendment is violated only by the combined risks of both compelling the employee to answer incriminating questions and compelling the employee to waive immunity from the use of those answers.").  Courts have interpreted <u>Garrity</u> as requiring more than just disciplinary action or paid suspension, rather it must involve a threat of severe economic sanction or

7

discharge. See, e.g., Chan v. Wodnicki, 123 F.3d 1005, 1009 (7th Cir. 1997)
(noting lower court's specific holding that it could find no case that had held that
any action short of discharge or suspension constituted such a threat); Singer v.
Maine, 49 F.3d 837, 847 (1st Cir. 1995) (Garrity not implicated because defendant
was not "put between the rock and the whirlpool" of incriminating himself or losing
his job).

Agent Blowers does not assert that either Agents Swecker or O'Korn
expressly made him choose between speaking or losing his job.  However, a
statement can still be considered compelled under Garrity if (1) there was a
subjective belief on the part of the defendant that choosing to remain silent would
result in the loss of his job and (2) this belief was objectively reasonable. See
United States v. Friedrick, 842 F.2d 382, 395 (D.C. Cir. 1988) ("Under the Garrity-
Lefkowitz-Murphy line of authority, [Defendant] must have in fact believed
his...statements to be compelled on threat of loss of job and this belief must have
been objectively reasonable."); United States v. Vangates, 287 F.3d 1315, 1322
(11th Cir. 2002) ("First, the defendant must have subjectively believed that he was
compelled to give a statement upon threat of loss of job. Second, this belief must
have been *objectively reasonable* at the time the statement was made.") (emphasis
in original).

Agent Blowers has not shown either a subjective or objectively reasonable
belief that if he refused to answer the questions posed in the May 2001 interview,

8

he would have been fired. Agent Blowers, SAC Swecker, and ASAC O'Korn all agree that at no time during the interview was Agent Blowers advised that he was required to answer the questions. (Blowers Aff. ¶ 7; Swecker Aff. ¶ 9; O'Korn Aff. ¶ 1-6.) Blowers, however, claims he believed that he was required to answer the questions posed by Agents Swecker and O'Korn, or else he "would be disciplined, and could be suspended or dismissed from the FBI" (Def.'s Mtn. for <u>Kastigar</u> Hearing ¶ 4 ). <u>Garrity</u> only applies to the situation where a government employee must waive his Fifth Amendment right to remain silent or risk job forfeiture. 385 U.S. at 497. Here, Agent Blowers' belief that he was required to answer the questions posed in the interview does not appear grounded in a fear of dismissal for invoking his right to remain silent.

Rather, Agent Blowers affidavit suggests that his belief at the time of the interview was that if he did not provide some satisfactory explanation for the rumors about his relationship with Simonini, he would be facing sanctions, suspension and/or dismissal for having associated with Simonini. For example, he states, "At the time of my interview with ASAC O'Korn and SAC Swecker in May 2001, I believed that if I refused to answer their questions about my relationship with David Simonini, I would be disciplined. More specifically, I believed a refusal on my part to address these allegations would cause an immediate suspension from all official duties...." (Blowers Aff. ¶ 9.) SAC Swecker explains that Agent Blowers appeared eager to speak his mind about the rumors and even offered

theories about the motivations of those he suspected made the allegations. (Swecker Aff. ¶¶ 9-12.) It may very well be true that if Agent Blowers did not provide some explanation regarding the trip to Vegas with David Simonini that he would have been in trouble with the Bureau, however, Blowers' fear of dismissal absent a suitable explanation for his actions is not the type of compulsion that Garrity and Kastigar were designed to address. Garrity, 385 U.S. at 497 (distinguishing the situation where "one who is anxious to make a clean breast of the whole affair volunteers the information"). Here, Agent Blowers' dismissal likely could have resulted from his actions involving Simonini and not his refusal to answer the questions posed in the May 2001 interview.

Additionally, Agent Blowers has not provided evidence that it was objectively reasonable for him to believe job loss would result if he refused to answer the agents' questions. Although Agents Swecker and O'Korn disagree on whether the summoning of Agent Blowers to the SAC's office was uncommon, neither of them assert that the purpose was to obtain a formal, compelled statement from Agent Blowers. (O'Korn Aff. ¶ 3; Swecker Aff. ¶ 9.) Additionally, the opinion of Richard Mosquera, presented by the defense and based on his experience in the Bureau, suffers from the same error as Agent Blowers' reasoning. (Mosquera Aff. ¶¶ 1, 5(C).) For example, Mosquera states:

> "Given the source of the allegations, a refusal by Agent Blowers to answer questions about his travel with Simonini would have been viewed as tantamount to a confession that something improper had in fact occurred, by both the United States Attorneys Office (which had

10

> initiated the inquiry and was expecting some response from SAC
> Swecker) and the FBI. (Mosquera Aff. ¶ 5(C).)

Thus, Mosquera also seems to confuse dismissal based on the unanswered

allegations with dismissal for refusal to answer the questions posed in the

interview.

Finally, although Agent Blowers points to several internal FBI manual

provisions to support his claim that it was objectively reasonable for him to believe

that his statements were compelled under Garrity, these provisions do not support

an objective belief by a lawyer and the Division's District Counsel that this was a

compelled statement.

Under the FBI's Manual of Administrative Operations and Procedures

("MAOP") § 13-6 (1) & (2), the decision whether or not to compel an employee to

make a full statement in an administrative inquiry is reserved to employees of the

Office of Professional Responsibility at FBI Headquarters (FBI-OPR). When this is

done, forms have been adopted to notify the employees being interviewed of their

rights and obligations. See MAOP § 13-6 (2) ("These forms are only to be utilized

during OFFICIAL administrative inquiries and only when authorized by FBIHQ

(primarily those supervised by OPR).") (emphasis in original). Section 1-21.2 of the

MAOP then  provides "[i]f an employee refuses to cooperate in an interview during

an administrative inquiry" that employee could be disciplined for insubordination,

possibly including dismissal. However, it is clear that when Blowers met with his

supervisors in May 2001 he was not the subject of an administrative inquiry, nor

participating in an administrative interview.

Section 13 of the MAOP provides detailed instructions outlining the procedures necessary for taking compelled statements. None of the steps required for taking a compelled statement from an agent were instituted during Blowers' interview. (See Swecker Aff. ¶¶ 9-10.) FBI-OPR had not authorized a compelled statement to be taken. Additionally, Agent Blowers' statement was neither recorded, sworn, nor signed. Agents Swecker and O'Korn did not even take notes of the conversation. (Swecker Aff. ¶ 9.) Given Agent Blowers' familiarity with the MAOP, a reasonable person in his position would have known the procedures and forms necessary during a compelled interview, none of which were utilized at that time. (Blowers Aff. ¶ 3); See MAOP § 13. Because this discussion was not an administrative inquiry by FBI-OPR, but rather an inter-office discussion between Blowers and his immediate supervisors, it was not reasonable for Blowers, the chief division counsel, to believe that statements in this conversation were being compelled by FBI rules or regulations. Because the statement was not compelled, the Government was free to use it in its investigation and prosecution of Agent Blowers.

III.

The second statement cited by the defense took place on December 4, 2000 and was given by Agent Blowers during an administrative investigation concerning a Title-III wiretap affidavit he submitted to a court. This matter and the statement

given are completely unrelated to both the indictment and the facts of the current

case against Blowers.  See United States v. Barber, 668 F.2d 778, 782 (4th Cir.

1982) (rejecting Kastigar claim when the information contained in the immunized

statement was from a prior investigation of defendant and "the information . . .

could have been of no use with respect to the subsequent . . . investigation).

Although both parties agree that this statement was compelled under Garrity, no

one has explained how the information provided in this statement was or could

have been used in the current investigation and prosecution.[7]  In fact, at the

hearing on this motion, the defendant's counsel conceded that there was no

evidence that this statement was used by the government in any way.[8]  Finally,

Agent Johnson explains that the summaries of this statement were discovered in

his review of the file in October of 2004 at FBI Headquarters. (Johnson Aff. ¶ 59.)

By this late date, Agent Johnson's investigation was well underway and the

evidence-gathering portion nearly complete. (Johnson Aff. ¶ 60.)  The theory of

---

[7]It is also unclear whether Agent Johnson read this statement during his investigation of Agent Blowers.  It appears that Agent Johnson reviewed a summary of the statement, including some quotes, written in a May 14, 2001 letter contained in the Official Personnel File and Official Security File of Blowers, but he claims that he never saw the actual December 4, 2000 statement. (Johnson Aff. ¶¶ 59-60.)

[8] Defense counsel's suggestion that a Kastigar hearing is necessary because there may be future use of this statement against Agent Blowers, i.e., in cross-examination, is premature.  See United States v. Byrd, 765 F.2d 1524, 1531 (11th Cir. 1985) (dismissing a similar claim stating that the "mere theoretical possibility of an eventual Kastigar violation at trial is no grounds for dismissing the indictment").

investigation regarding false statements on his Financial Disclosure Forms had been developed and pursued, and the search warrant of Agent Blowers' office based on this theory had been executed. See Barber, 668 F.2d at 782 (dismissing Kastigar claim in part because the investigation was well underway by the time the government was exposed to the immunized statements). Because Blowers provides no suggestion of how the contents of the December 4, 2000 statement was or could be used against him in this case, a Kastigar hearing regarding that statement is unnecessary.

### IV.

Mr. Blowers has, however, provided sufficient evidence to necessitate a Kastigar hearing regarding his February 20, 2002 statement. Prior to his February 20, 2002 statement Agent Blowers read and signed an OIG Form III-226/3 indicating that he was required to provide the information requested in the interview. Thus, this statement was clearly compelled under Garrity. During the interview, Blowers was required to answer questions regarding the ethical advice that he gave to FBI employees in relation to an administrative investigation of another FBI Agent. Additionally, the government has admitted that both Agent Johnson and Trial Attorney Daniel A. Petalas were exposed to this statement on or around June 25, 2004. (Johnson Aff. ¶ 28.)

Although Agent Johnson states in his affidavit that he did not "conduct any investigative steps or obtain any investigative leads" as a result of his review of

this statement (Johnson Aff. ¶¶ 25-29), evidence presented by the defense calls this position into question. However, reliance on affidavit evidence in lieu of a Kastigar hearing is only proper when the affidavits conclusively demonstrate prior knowledge and do not "simply ask the court to rely on the government's good faith." United States v. Harlott, 807 F.Supp. 270, 282 (W.D.N.Y. 1992); see also United States v. Dudden, 65 F.3d 1461, 1469 (9th Cir. 1995) (noting that "a hearing is not required if no factual issues are left to resolve, or if the government meets its burden to show independent sources through the use of affidavits"). Here, Agent Blowers points to evidence that requires further explanation from the government regarding the February 20, 2002 statement.  Specifically, the series of events that took place on June 25, 2004 suggest that this statement may have influenced the investigative strategy of Agent Johnson.  First, Agent Johnson's affidavit states that an unidentified attorney for OIG contacted him and asked him to review the closed file containing the compelled statement.  On June 25, 2004 Agent Johnson reviewed this file and read Agent Blowers' February 20, 2002 compelled statement.  Then, on that same day, Agent Johnson called ASAC O'Korn and asked him questions related to any ethics advice or opinions given by Blowers. (Blowers' Reply to Consolidated Response at ¶ 4.)  Given the sequence of these events, a Kastigar hearing is necessary.  The burden will be on the government to show an independent source for its prosecution strategy against Agent Blowers.

## V.

Finally, Agent Blowers claims that his May 19, 2003 compelled statement has been improperly used by the government in the investigation and prosecution of this case. Blowers gave a compelled statement regarding the allegations in this case to agents from the FBI-OPR on May 19, 2003. Following this statement a taint procedure was instituted by the government. The FBI-OPR was directed not to share with the OIG or Agent Johnson that statement or the results of any investigative steps taken after the compelled statement. (Johnson Aff. ¶ 5.) Additionally, during the discovery phase of the case, a prosecutor from the Public Integrity Section, Natashia Tidwell, who was not involved in the investigation or prosecution of the case was assigned to review the materials in the OPR File from May 19, 2003 forward. (Tidwell Aff. ¶ 5; Johnson Aff. ¶ 71.)

Mr. Blowers asserts, however, that Agent Johnson's subsequent contact with ASAC O'Korn violated this taint procedure. In early September 2003, Agent Johnson contacted ASAC O'Korn, Agent Blowers' former supervisor, by telephone for an interview. ASAC O'Korn was advised that Agent Johnson, was not supposed to know about any statements Blowers made to the FBI-OPR, including the May 19, 2003 statement, or any information gained from that investigation. (O'Korn Aff. ¶ 9.) At that point ASAC O'Korn informed Agent Johnson that he had read the May 19, 2003 statement. (O'Korn Aff. ¶ 9.) Agent Johnson then asked ASAC O'Korn to attempt to answer his questions without referring to the

16

information seen on the May 19, 2003 statement, and proceeded with the

interview. (O'Korn Aff. ¶ 10.)  ASAC O'Korn states that he attempted to do so

but, "cannot say that what I learned from reading Blowers' May 2003 statement

had absolutely no effect on what I told Johnson in these subsequent

conversations." (O'Korn Aff. ¶ 11.)

ASAC O'Korn also appeared before the grand jury in this case on December

14, 2004.  Agent Blowers has suggested that some of his grand jury testimony

was also influenced by what O'Korn read in the May 19, 2003 statement.  In

relation to his grand jury testimony, O'Korn states that he was not warned at that

time to not discuss anything that he had learned from reading this compelled

statement and that "because I had learned of information over the four years of the

investigation into Agent Blowers, it would have been difficult to be able to separate

my knowledge even if I had been so requested." (O'Korn Aff. ¶ 12.)

The government's evidence provided thus far does not show conclusively

that ASAC O'Korn's exposure to this previously immunized statement was not a

factor in his statements to Agent Johnson.  Additionally, the government has not

shown that the information gained from reading the compelled statement did not

affect his grand jury testimony.  See United States v. North, 920 F.2d 940, 942

(D.C. 1990) (holding that a violation of Kastigar also may occur when the

prosecution puts on a witness that was exposed to compelled testimony).  Thus, a

Kastigar hearing is necessary regarding the May 19, 2003 statement.

17

## VI.

Agent Blowers' motion for a <u>Kastigar</u> hearing will be GRANTED as it relates to his February 20, 2002 statement and the May 19, 2003 statement. A pre-trial hearing will be noticed and the burden will be on the government to show that its evidence has an independent source. However, Agent Blowers' motion will be DENIED as it relates to the May 2001 statement because he has not shown that this statement was compelled under <u>Garrity</u>. Finally, because Agent Blowers has presented no suggestion of how his December 4, 2000 statement relates to or could be used against him in this case, his motion for <u>Kastigar</u> hearing will be DENIED as it relates to that statement.

This the 17th day of October, 2005.

United States District Judge

18