IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | 3:05-CR-0093 |
| | ) | |
| ERIK B. BLOWERS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM ORDER**

TILLEY, Chief Judge[1]

This case arises from the prosecution of Erik B. Blowers by the United States of America and is currently before the Court on Blowers' Motion for <u>Kastigar</u> Hearing, Motion to Dismiss, and Motion to Suppress [Doc. # 46] ("<u>Kastigar</u> Motion").

For the reasons set forth below, it will be ordered that Blowers' Motion to Dismiss and Motion to Suppress be DENIED.[2]

I.

Defendant Blowers, a Special Agent with the FBI, was indicted by a grand jury sitting in Charlotte, North Carolina on April 12, 2005. The indictment charged Agent Blowers with knowingly and willfully making a false material statement on October 31, 2000 to the Federal Bureau of Investigation on his Confidential

---

[1]Middle District of North Carolina, sitting by designation

[2] The portion of Doc. #46 that moved for a <u>Kastigar</u> Hearing was granted in part and denied in part in an October 17, 2005 Order [Doc. # 65].

Financial Disclosure Report for the year 2000 in violation of Title 18, United States Code, § 1001(a)(2). During the year 2000 Blowers, an attorney, held the position of Chief Division Counsel for the Charlotte Division, an office that includes all FBI agents stationed in North Carolina. Among the responsibilities of the Chief Division Counsel or "CDC" is the advising of agents in that division concerning the propriety of receiving gifts from others and concerning the proper completion of the annual Confidential Financial Disclosure Report. During the period from April through June, 2000 Agent Blowers also held the position in the Charlotte Division of Acting Supervisor of the White Collar Criminal Unit.

The charge in this case stems from gifts, including free travel, Blowers allegedly received from David Simonini in connection with trips he took to Las Vegas with Simonini in April and August of 2000. Simonini, a former cooperating witness who had been "managed" by Agent Blowers, was – in April 2000 – the subject of a preliminary investigation by the white collar crime unit. These trips were not reported on Agent Blowers' 2000 Financial Disclosure Report.

The decision to seek the indictment of Agent Blowers was made by the Public Integrity Section of the Criminal Division of the U.S. Department of Justice. Eric A. Johnson, Special Agent in the Department of Justice's Office of the Inspector General ("OIG") was asked by his OIG superiors to investigate the allegations referred from the Public Integrity Section. (Johnson Aff. ¶¶ 1-2.) From that point forward, Agent Johnson was the lead investigator on Blowers' case.

On June 25, 2004, a year into his investigation, Agent Johnson was exposed to a compelled statement given by Blowers on February 20, 2002. Blowers had given the statement in an unrelated administrative investigation by OIG into the acceptance of a gift of free travel by another FBI agent in the Charlotte Division. Blowers' statement was contained in a file compiled during the investigation and concerned his role as Chief Division Counsel in advising the other agent about the propriety of accepting the free travel. Prior to responding to inquiries, Blowers had executed OIG Form III-226/3 which provided that Blowers was required to give truthful answers, that a failure to cooperate would subject him to discipline and possibly, even, termination, and that none of the information he related could be used as evidence against him in a criminal proceeding or as an investigative lead in the gathering of evidence.

In addition to Blowers, several other agents had been interviewed that day including the agent who was the subject of the investigation.[3] All of these interviews were in the file which Agent Johnson read before forwarding its contents to Trial Attorney Daniel A. Petalas.

On August 3, 2005 Blowers filed this motion requesting a Kastigar hearing[4]

---

[3] It appears from the investigation file that some of the statements were signed on February 21, 2002, but that all of the interviews were conducted on February 20, 2002.

[4] In Kastigar v. United States, 406 U.S. 441, 461-62, 92 S.Ct. 1653, 1665 (1972), the Supreme Court held that a person whose testimony has been compelled pursuant to 18 U.S.C. § 6002, a use immunity statute, is entitled to a

3

[Doc. #46], to determine whether the Government can prove that each piece of its evidence comes from an independent source and was not derived directly or indirectly from Agent Blowers' February 20, 2002 statement. The Government responded to Blowers' motion in the Consolidated Response of the United States to Pretrial Motions and Motion in Limine on September 9, 2005 [Doc. # 56]. Blowers' reply to the Government's consolidated response was filed on September 23, 2005 [Doc. #57].[5] On October 17, 2005, a Memorandum Order was issued granting Blowers' motion for a Kastigar hearing as it related to his February 20, 2002 statement and his May 19, 2003 statement, and denying Blowers' motion for a Kastigar hearing as it related to his May 2001 and December 4, 2000 statements [Doc. #65].

A Kastigar hearing was held on November 1, 2005 and November 2, 2005. At the Kastigar hearing, Blowers argued that his two statements, February 20, 2002 and May 19, 2003, were compelled Garrity statements,[6] that were

---

hearing to determine whether those statements were impermissibly used directly or indirectly to gather other incriminating evidence or whether the Government's evidence has a basis independent of the compelled statements.

[5] An Amicus Memorandum in Support of Motion for Kastigar Hearing was filed by The Federal Bureau of Investigation Agents' Association on September 29, 2005 [Doc. # 58].

[6] In Garrity v. New Jersey, 385 U.S. 493, 495, 87 S.Ct 616, 617 (1967) the Supreme Court considered whether incriminating statements made by police officers were "compelled," and their later used against the officers, therefore, prohibited, when a state statute required the officers either to respond to questions or be involuntarily terminated from their jobs. "The question is whether the

4

impermissibly used by the Government in preparing this case for indictment. Blowers' Kastigar Motion asks that at the conclusion of the hearing, the Court dismiss the Indictment, or in the alternative, suppress all Garrity statements and evidence gained directly or indirectly from those statements. During the Kastigar hearing, this Court issued an oral opinion finding that the Government had met its burden with regard to the May 19, 2003 statement. Thus, the Court will now consider Blowers' Motion to Dismiss and Motion to Suppress only as it pertains to his February 20, 2002 statement.

II.

The Fifth Amendment to the United States Constitution provides that "No person ... shall be compelled in any criminal case to be a witness against himself ...." U.S. Const. amend V. In Garrity v. New Jersey, the Supreme Court established that the Fifth Amendment's protection extends to persons who have no choice but to speak or face dismissal from public employment. 385 U.S. 493, 500, 87 S.Ct 616, 617 (1967). However, in Kastigar v. United States, the Supreme Court has held that a grant of "use" immunity under 18 U.S.C. § 6002 enables the Government to compel a witness's self-incriminating testimony.[7] 406

---

accused was deprived of his 'free choice to admit, to deny, or refuse to answer." Id. at 496 (internal citation omitted).

[7] Use immunity is to be distinguished from the broader concept of transactional immunity. Transactional immunity "protects an individual against prosecution for anything concerning the substance of compelled testimony," while "use immunity protects against the Government's use of compulsory testimony as

U.S. 441, 461-62, 92 S.Ct. 1653, 1665 (1972). Section 6002 "prohibits the prosecutorial authorities from using the compelled testimony in *any* respect, and it therefore cannot lead to the infliction of criminal penalties on the witness." Id. at 453. "The scope of immunity provided by § 6002 is coextensive with the scope of the Fifth Amendment privilege against compelled self-incrimination." Id. at 448-49.

The statements in the OIG Form III-226/3 to the effect that a witness in an administrative inquiry must furnish complete and truthful information or face discipline up to and including termination, along with the accompanying assertion that none of the information given could be used directly or indirectly against the witness in a criminal prosecution is the FBI's obvious solution to potential Garrity problems, implementing an administrative equivalent to § 6002. In analyzing whether there has been a violation of the use immunity assurances made to Agent Blowers on February 20, 2002, the Court will adopt the same approach mandated by Kastigar and its progeny for § 6002 cases.

When a claim is raised, the claimant must first show that he testified under a grant of immunity or, here, its functional equivalent. Once this is established, the burden then shifts to the Government to prove that its evidence comes from sources independent of the compelled testimony. Id. at 461-62. In the Kastigar

---

a source of evidence, leaving the Government free to use any other evidence to prosecute." United States v. Harris, 973 F.2d 333, 336 (4th Cir. 1992).

hearing the Government has the affirmative burden to make its proof by a preponderance of the evidence. Id. (noting that the standard of proof is a preponderance of the evidence even though the Government's burden is often referred to as a "heavy burden"). The Court in Kastigar also explained that the "total prohibition on use provides a comprehensive safeguard, barring the use of compelled testimony as an 'investigatory lead,' and also barring the use of any evidence obtained by focusing investigation on a witness as a result of his compelled disclosures." Harris, 973 F.2d at 336-37 (quoting, Kastigar, 406 U.S. at 460). Thus, the Government is not allowed to alter its investigatory strategy as a result of information contained in an immunized statement. Harris, 973 F.2d at 336.

III.

It is clear that Blowers statement given on February 20, 2002 was compelled under Garrity. Prior to his February 20, 2002 statement Agent Blowers read and signed an administrative advice of rights OIG Form III-226/3 indicating that he was required to provide the information requested in the interview. Additionally, the Government has admitted that both Agent Johnson and Trial Attorney Daniel A. Petalas were exposed to this statement on or around June 25, 2004. (Johnson Aff. ¶ 28.) However, mere exposure of the prosecution team to an immunized statement does not require dismissal of an indictment, suppression of evidence, or overturning a conviction. See Harris, 973 F.2d at 337-38. Rather

there must be "use." Thus, the only issue remaining is whether the Government impermissibly "used" this statement or its contents under Kastigar.

First, Blowers argues that as a result of its exposure to his February 20, 2002 statement, the Government began to focus on his Confidential Financial Disclosure Report (Form 450) and a possible indictment for a violation of 18 U.S.C. § 1001(a)(2) ("§ 1001 violation"). Blowers contends that prior to reading his statement the Government's investigation was broader, including a number of different incidents and potential charges, many of which were unrelated to his Form 450. However, Blowers argues that because his statement relates to the ethics of receiving gifts, and more specifically the gift of free travel, the statement caused the Government's case to be narrowed to the present charge for a violation of § 1001.

The Government has presented sufficient evidence to demonstrate that the investigation of Blowers was focused on a § 1001 violation prior to its exposure to the compelled statement on June 25, 2004. First, only one month after he was assigned as the case agent for the Blowers investigation, on July 15, 2003, Agent Johnson requested a copy of Blowers' Form 450s for the years in question. That same month, Agent Johnson interviewed David Simonini asking questions about the trips to Las Vegas as well as who paid for the trip expenses. Agent Johnson also reviewed FBI manuals regarding ethics and did independent research to determine whether Blowers paid for his own trip to Las Vegas. In August of 2003,

Agent Johnson interviewed Bill Miller, the Chief of the Administrative Law Unit, regarding the ethics requirements for accepting and reporting gratuities – specifically asking if airplane tickets and golf green fees would have to be disclosed on a Form 450. Also, in October 2003, Agent Johnson had interviewed FBI Special Agent Eric Davis, an attorney by training and a person who assisted Blowers from time to time in fulfilling the CDC position, about ethics and the responsibilities of the CDC. All of these investigative steps took place before Agent Johnson's exposure to Blowers' compelled statement.

Additionally, on June 24, 2004, the day before the reading of the compelled statement by Agent Johnson and Attorney Petalas, a meeting was held in the Public Integrity Section to discuss the status of a number of cases, including Blowers' case. The meeting was attended by Agent Johnson; Trial Attorney Petalas; Noel Hellman, Chief of the Public Integrity Section; Stewart Goldberg, Deputy Chief of the Public Integrity Section; Mike Fletcher, an OIG Agent; and Scott Dahl, Special Counsel for the OIG. Agent Johnson testified that the evidence gathered up to that point was discussed at the meeting and that a decision was made that the Public Integrity Section would consider prosecuting and charging Blowers with a violation of 18 U.S.C. § 1001, specifically, for his falsification of the year 2000 Form 450. The Government also presented other evidence corroborating Agent Johnson's recollection of the June 24, 2004 meeting. Agent Johnson's own notes state "Blowers - 1001 prosecution. Dan [Petalas] [and]

9

Stuart [Goldberg] on board - G.J. [Grand Jury] quickly." (Gov't Ex. 17R.) Similarly, Attorney Petalas' notes state "BL [Blowers] 1001 appropriate." (Gov't Ex. 13.) Stewart Goldberg's notes from the meeting also focus on the decision to move forward with the § 1001 charge and specific actions to be taken in that regard. His notes refer to the EIGA (Ethics in Government Act) and discuss conducting interviews with Blowers' supervisors, Swecker and O'Korn, regarding benefits Blowers may have received, specifically golf clubs. (Gov't Ex. 8R.)

The Government has shown that the investigation of a possible violation of § 1001 was well underway by the time the compelled statement was read and that a § 1001 charge was the focus of discussion at the June 24, 2004 meeting. Thus, the Government has met its burden by showing that it did not "use" Blowers' February 20, 2002 compelled statement to narrow their investigation to a § 1001 violation. See United States v. Barber, 668 F.2d 778, 782 (4th Cir. 1982) (holding Government satisfactorily established that immunized statements had not been used when by the time the prosecution gained access to the immunized statements, its investigation was already well under way).

Blowers next argues that even if the Government had decided on the § 1001 charge, its exposure to his February 20, 2002 statement impermissibly altered the focus of the investigation. Harris, 973 F.2d at 336 ("It is not legitimate for the Government to alter its investigatory strategy as a result of the immunized statement."). Specifically, Blowers contends that it was not until after being

exposed to the file containing his compelled statement that the Government began (1) looking for specific instances of ethics advice and opinions that Blowers gave to agents in his division, (2) seeking evidence of Blowers' training of ethic requirements, and (3) applying for a search warrant to search Blowers' office for evidence concerning ethics, and specifically the acceptance of gifts or other things of value. Because the administrative file reviewed by Agent Johnson contained an example of Blowers' giving ethics advice, Blowers contends that the Government used this information to find other evidence relating to his knowledge of the FBI's ethics requirements. The Government, however, has met its burden by showing that not only was it already focused on "tightening up" the evidence of Blowers' knowledge of the ethical rules by examining his activities as CDC, but also that it was exactly this goal that led Agent Johnson to examine the file containing Blowers' compelled statement in the first place.

At the Kastigar hearing Attorney Petalas testified that during the meeting on June 24, 2004, he and Agent Johnson were instructed to take additional steps to "nail down" the matter of Blowers' role as ethics advisor to the agents in the Charlotte division. At that time the existence of a previous administrative investigation was mentioned and the suggestion was made to review that file and see what role Blowers had in that matter. In fact, in a "to do" list prepared by Attorney Petalas on that same date, he noted his intention to review the investigation file in order to see how "gifts" were treated by Blowers. (Gov.'t Ex.

14R.)

Blowers suggests that the Government's decision in that June 24, 2004 meeting to read that file was somehow improper. There is no indication, however, that any of the attendees at the meeting were aware that the file contained a compelled statement by Blowers. In fact, Agent Johnson and Attorney Petalas, both testified that although they thought the file would contain a statement by Blowers, they were not aware, nor expecting, that the statement would have been compelled. However, it is clear they knew that a situation involving gifts, and specifically the gift of free travel, had previously been investigated and that Agent Blowers had likely been involved in that investigation because as CDC he was the ethics advisor for the division. It is this knowledge that led the Government to take the permissible action of reviewing the file. Although it is undisputed that Blowers' statement contained in that file was compelled and that its contents may not be used in developing the Government's case, that is not the focus of the inquiry here.[8] See Harris, 973 F.2d at 338 ("We agree with the Government that '[t]he focus of the inquiry under Kastigar . . . is not whether the prosecutor was aware of the contents of the immunized testimony, but whether he used the testimony in

---

[8] It is, however, important to note that no evidence was presented showing the Government acted in bad faith by reading Blowers' February 20, 2002 statement. Because the investigative file contained information entirely unrelated to Blowers and he was involved only because of his role as CDC, it is understandable that the Government did not realize reading the statement would be a problem in this case until a point much later.

any way to build a case against the defendant.'"). Rather, the question here is whether the Government's exposure to Blowers' statement caused it to alter its investigative strategy. Because the Government has shown that it was already aware of the subject of the administrative inquiry and that its goal in looking at the file was to find specific instances where Blowers' gave ethics advice, the claim that this strategy resulted from reading the statement fails. The Government has sufficiently demonstrated that it did not impermissibly "use" the statement in violation of Kastigar. See United States v. France, 164 F.3d 203, 206-07 (4th Cir. 1998) (holding no Kastigar error where Government was aware of relevant information prior to exposure to defendant's immunized statement).

Finally, Blowers contends that the steps taken immediately after the reading of his compelled statement on June 25, 2004 are proof of the Government's impermissible "use." After Agent Johnson read the file of the administrative investigation, he sent an e-mail summarizing its contents to Dahl. This e-mail was then forwarded to some of the other attendees at the June 24, 2004 meeting; including Goldberg, Hillman, and Attorney Petalas. Goldberg then responded:

> Thx. Eric - have you looked for or come across other instances where Blowers gave advice on what a prohibited source was, what the rules are on associating with felons or what financial disclosure forms and other rules require concerning the receipt of gifts? Did Blowers keep a log or other record of advice given? Does HG ethics personnel log or otherwise track what inquiries come from the field? (Gov.t' Ex. 4R.)

Agent Johnson then responded to the questions posed by Goldberg in an e-mail on that same date.

13

Blowers argues that this exchange illustrates that his February 20, 2002 compelled statement was "used" against him in violation of Kastigar. This argument fails for several reasons. First, although it is clear that immediately after the reading of the file containing Blowers' compelled statement a series of e-mails ensued regarding future steps to be taken, there is no evidence that the contents of these e-mails arose out of the information in the February 20, 2002 statement. The testimony and evidence presented at the hearing show that a decision was made the day before the reading of the statement to move forward and gather evidence to support a § 1001 charge "quickly." Additionally, the Government has provided ample evidence that the investigation was focused on Blowers' role as ethics advisor before the statement was read. In fact, Attorney Petalas' post meeting "to do" list includes the following entries: look for specific instances of Blowers giving ethics advice, interview all supervisors (including Swecker and O'Korn), and "nail down" Blowers' ethics role as CDC. (Gov.t' Ex. 14.) Additionally, nothing in Blowers' compelled statement mentions rules on associating with felons, financial disclosure forms, ethics logs or any other records of ethics advice given. Rather, Goldberg's email appears to be part of a continuing effort begun at the June 24, 2002 meeting to brainstorm for evidence that would support a claim that Blowers had knowledge of the ethic rules governing his acceptance of free travel and the requirement that it be reported on the Form 450. Thus, Blowers' argument that the reading of the statement somehow altered the

focus or sped things up relating to a possible § 1001 charge is unsupported. It is clear that the investigation was focused on the § 1001 charge and moving quickly to find evidence to satisfy the "knowing and willful" requirement prior to the Government's exposure to his compelled statement.

Similarly, Blowers' claim that the search warrant application was an impermissible "use" of his statement is unpersuasive. Blowers claims that because the application for the search warrant included looking for ethics "opinions" or "advice" given by Blowers concerning "acceptance of gifts, benefits and/or things of value" it stems from the reading of his February 20, 2002 statement. However, Blowers' argument fails to recognize that the Government already had this investigative lead when it went to look at the administrative file containing the statement and that is why the file was pulled in the first place. The argument that such leads were a result of that action, is too speculative. See Welsh v. Holt, 78 F.3d 580, 1996 WL 84487, at *3 (4th Cir., Feb. 28, 1996) (upholding district court because "the occurrences [defendant] identifies amount to merely speculative opportunities for taint to occur, and '[t]he Government is not required to negate all abstract 'possibility' of taint.'") (citing United States v. Byrd, 765 F.2d 1524, 1529 (11th Cir.1985)); accord United States v. Kilroy, 27 F.3d 679, 681-82, 687 (D.C. Cir. 1994) (rejecting claim that Government "used" immunized statement when defendant's theory of effect on the charging decision was speculative).

The situation here is similar to that addressed by the Fourth Circuit in United

States v. Barber. 668 F.2d at 782. There, the court stated, "[g]iven that the investigation was already focusing, before the [compelled statements] surfaced, on all aspects [of the charge], it strains credulity to assert that the Government would not have uncovered, quite independently of the forms, further confirmation of its strong investigatory leads." Id.; accord United States v. Streck, 958 F.2d 141, 145-46 (6th Cir. 1992) (finding that it is "beyond dispute" that the contents of the immunized letter would have been discovered even if the letter had not existed). Because it is clear that the Government had focused its investigation of Blowers on a violation of § 1001 and specifically on "nailing down" what ethic responsibilities he had as the CDC, what advice he had given to other agents, and generally his knowledge about ethics, there is no evidence that the information contained in Blowers' February 20, 2002 statement changed this investigation in any way.

Additionally, the administrative file which contained Blowers' compelled statement also contained independent sources for the information contained in that compelled statement. The file included statements from several other agents including the subject of the investigation. Each of these statements described the role that Blowers had played in the decision of whether or not the acceptance of the gift at issue was ethical. All of the interviews taken that day were scheduled in advance. Also, there is no evidence in the file to suggest that his statement was read by any other interviewee or that questions asked by the interviewers were influenced in any way by Blowers' statement. Because there is no evidence to

support Blowers' claim that the other statements in the file were tainted by Blowers' statement, the Government has shown it would have exactly the same information if Blowers' statement were not included in the administrative file.[9] See Streck, 958 F.2d at 145. Thus, the Government has met its burden of proving legitimate independent sources for the information used to investigate Blowers and bringing the indictment under § 1001.

IV.

For the reasons set forth above, Defendant Blowers' Motion to Dismiss and Motion to Suppress is DENIED.

This the day of November 21, 2005

/s/
United States District Judge

---

[9] Blowers' argument that one line of Blowers' compelled statement could not be found in the other statement in the file is rejected because he could point to no way that that piece of information was used in the investigation.